J-S71021-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| OLIVER CABRERA | : | |
| | : | |
| Appellant | : | No. 4070 EDA 2017 |

Appeal from the Judgment of Sentence November 28, 2017
In the Court of Common Pleas of Bucks County Criminal Division at
No(s):  CP-09-CR-0001470-2017

BEFORE: PANELLA, J., DUBOW, J., and NICHOLS, J.

MEMORANDUM BY NICHOLS, J.:                    **FILED APRIL 15, 2019**

Appellant Oliver Cabrera appeals from the judgment of sentence for 154 to 308 months' imprisonment following a jury trial and his convictions for corrupt organizations, robbery, aggravated assault, burglary, conspiracy, theft by unlawful taking or disposition, receiving stolen property, simple assault, and criminal mischief.[1]  Appellant alleges the trial court erred by denying his motion to sever, motion to suppress, and motion to preclude evidence of a prior bad act.  He also challenges the discretionary aspects of his sentence and the sufficiency of evidence for his convictions of corrupt organization and burglary.  We affirm.

_____

[1] 18 Pa.C.S. §§ 911, 3701, 2702, 3502, 903, 3921, 3925, 2701, 3304.

We adopt the trial court's facts and procedural history. ***See*** Trial Ct. Op., 4/4/18, at 1-11. The court sentenced Appellant on November 28, 2017. Appellant filed, and the court denied, a timely post-sentence motion requesting reconsideration of his sentence. Appellant timely appealed and timely filed a court-ordered Pa.R.A.P. 1925(b) statement.

On appeal, Appellant raises the following questions:

[1]. Did the trial court abuse its discretion by not granting Appellant's motion to sever?

[2]. Did the trial court error in not granting Appellant's motion to suppress?

[3]. Did the trial court error in not granting Appellant's motion *in limine*?

[4]. Did the trial court's sentence rise to the level of manifest abuse of discretion?

[5]. Was the evidence sufficient to support the conviction?

Appellant's Brief at 4.

After careful review of the parties' briefs, the record, and the trial court's decision, we adopt and affirm on the basis of the trial court's decision addressing the merits of the issues raised in this appeal.[2] ***See*** Trial Ct. Op.

---

[2] We do not, however, adopt the trial court's rationale for the initial vehicle stop, as Appellant did not challenge the initial stop on appeal. ***See*** Trial Ct. Op. at 19-20. We also do not adopt the trial court's assertion that Appellant waived his sufficiency challenge due to a vague Pa.R.A.P. 1925(b) statement, ***see id.*** at 30-31, because the trial court addressed Appellant's challenges to the sufficiency of evidence for corrupt organizations and burglary.

at 11-19, 20-30. The trial court reasoned that Appellant's motion to sever the robbery was properly denied for a few reasons. First, evidence of the robbery would permit the Commonwealth to prove the offense of corrupt organizations and conspiracy. *See id.* at 11-13. Second, evidence of the robbery would be admissible to establish a common plan or scheme. *See id.* at 13-14. As for Appellant's challenge to his motion to suppress, we agree with the trial court that the police were justified in searching the vehicle's interior given the occupants' furtive movements. *See id.* at 21-22. Similarly, we see no abuse of discretion with the trial court's decision to admit evidence of the New Jersey burglary and robbery because it helped prove the charges of corrupt organizations and conspiracy. *See id.* at 22-24. Finally, after reviewing the record in the light most favorable to the Commonwealth, we agree there was sufficient evidence to sustain Appellant's convictions for burglary and corrupt organizations. *See id.* at 31-32. We add that Appellant has fulfilled the preliminary elements identified in *Commonwealth v. Colon*, 102 A.3d 1033, 1042-43 (Pa. Super. 2014), for challenging the discretionary aspects of his sentence, but we agree with the trial court that he is not entitled to relief. *See* Trial Ct. Op. at 24-29. Accordingly, having discerned no abuse of discretion or error of law, we affirm the judgment of sentence entered below.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/15/19

**IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA
CRIMINAL DIVISION**

COMMONWEALTH OF PENNSYLVANIA :    No.    **CP-09-CR-0001470-2017**

             v.                 :       **[4070 EDA 2017]**

OLIVER CABRERA              :

## OPINION

The Defendant, Oliver Cabrera, has appealed from the judgment of sentence entered on November 28, 2017.

On August 25, 2017, following a trial by jury, the Defendant was convicted of one count of Corrupt Organizations, 18 Pa.C.S. §911(b)(1), one count of Criminal Conspiracy, 18 Pa.C.S. §903, one count of Burglary - Overnight Accommodation, Person Present, 18 Pa.C.S. §3502(a)(1), two counts of Robbery, 18 Pa.C.S. §3701(a)(1)(iv), two counts of Simple Assault, 18 Pa.C.S. §2701(a)(1), five counts of Burglary - Overnight Accommodation, No Person Present, 18 Pa.C.S. §3502(a)(2), six counts of Theft by Unlawful Taking, 18 Pa.C.S. §3921(a), six counts of Receiving Stolen Property, 18 Pa.C.S. §3925(a), and six counts of Criminal Mischief, 18 Pa.C.S. §3304(a)(2). The Defendant was sentenced on November 28, 2017. On December 1, 2017, the Defendant filed a Motion to Reconsider Sentence. That motion was denied by Order dated December 11, 2017.

The charges in this matter arose out of the Defendant's participation in a burglary ring operated out of Trenton, New Jersey by the Defendant, Alex Lora, Raymond Munn, Christopher Upshur and Chris Rodriguez. The ring operated in New Jersey and in Bucks County. The group initially committed daytime burglaries of unoccupied residences. Later, the group began to burglarize occupied residences, targeting individuals who sold goods at flea markets.

The first Bucks County burglary occurred on July 30, 2012 at the residence of Nancy Harris located at 435 Stoneybrook Road in Newtown, Upper Makefield Township. When Mrs. Harris left her home at 8:00 that morning, her late husband's Lexus was parked in the garage. When she returned two hours later, she found that her home had been burglarized and the Lexus had been taken. Her home had been ransacked; drawers were pulled out and their contents were scattered on the floor. Items stolen during the burglary included a Rolex watch and jewelry, including diamond rings, gold bracelets, pearl earrings, emerald earrings and various necklaces her husband had given her throughout their marriage. N.T. 8/23/17, pp. 100-111.

The second Bucks County burglary occurred on August 8, 2012 at the residence of Dorothy and John Carr located at 5 St. James Place in Yardley. The Carrs left their home at 10:45 that morning to go to the market. When they returned an hour and a half later, the Carrs found that their home had been burglarized. The home had been ransacked; drawers were pulled out and their contents were scattered on the floor. Valuable pieces of china the couple had purchased on their honeymoon had been broken. It was later determined that forcible entry had been made into the home through a first floor window in the back of the home. Jewelry, wedding rings, three firearms, cameras, distinctive pillowcases and other items had been stolen from the home. Although some costume jewelry and the pillow cases were ultimately returned, the valuables were not recovered. N.T. 8/23/17, pp. 122-132.

The third Bucks County burglary occurred on August 21, 2012 at the residence of Karen Zewe and her husband located at 1605 Ginko Lane in Yardley. Mrs. Zewe left her home that morning to go to the bank and the store. When she returned approximately fifteen minutes later, she found the police at her home and realized that her home had been burglarized. The bedrooms were ransacked, drawers were pulled out of dressers and closet doors were open. A

2

computer, an iPad, all of Mrs. Zewe's jewelry, a coin collection, and other items had been stolen from the home. N.T. 8/23/17, pp. 208-214, 217-218; Exs. C-28 through C-44. It was later determined that forcible entry into the residence had been made through a window in the back of the home. N.T. 8/24/17, pp. 152-154.

The fourth Bucks County burglary occurred on September 1, 2012 at the residence of Jim Abramson and his wife located at 701 River Road in Yardley. Mr. Abramson left his home the previous day to go to the New Jersey shore for the Labor Day weekend. In the late afternoon hours of Saturday, September 1, 2012, Mr. Abramson received a report from his alarm company that his home alarm had been activated. Mr. Abramson instructed the alarm company to call the police. When he returned home at approximately 7:00 p.m., the police were at his residence. The home had been vandalized; every dresser drawer had been emptied onto the floor. An iPad, watches and a safe containing important paperwork and most of Mrs. Abramson's jewelry had been stolen from the home. It was later determined that forcible entry had been made through a window at the back of the home. Only the iPad was recovered. N.T. 8/24/17, pp. 147-159.

The fifth Bucks County burglary occurred at the residence of Patricia Stone and her husband located at 909 River Road in Washington Crossing. The burglary was discovered on Monday, September 3, 2012, when Mrs. Stone returned from a trip and found that her home had been burglarized. The home had been ransacked; the contents of drawers and closets emptied onto the floor. An antique engraved bracelet, two antique guns and other items had been stolen from the home. N.T. 8/23/17, pp. 223-229. It was later determined that forcible entry had been made through a window in the family room at the rear of the home. N.T. 8/23/17, p. 230. All of Mrs. Stone's property was recovered later that day. N.T. 8/23/17, pp. 230-232; Ex. C-52.

3

The sixth Bucks County burglary occurred at the residence of Harvey Gray, age 84, and his wife Rebecca Gray, age 82, located at 1708 Fite Terrace in Langhorne. Mr. Gray ran a junk yard, dismantling cars and trucks and selling the parts at flea markets. At 9:55 p.m. on September 10, 2012, he was at home with his wife when someone knocked on the door. When Mrs. Gray opened the door, three men barged through knocking her to the floor. Her hands were bound behind her back with zip ties and couch cushions were placed around her so that she could not see. One of the intruders pointed a gun at Mr. Gray, told him he was going to be shot and ordered him to get his money. Mr. Gray, dressed only in a tee shirt and underwear, had his hands bound behind his back with zip ties and was forced from room to room to show the intruders where money and valuables were kept. When he told them that he did not have a safe, the intruders began to tear pictures from the walls and break through drywall looking for one. When the intruders left his home, Mr. Gray, barefoot, in his underwear, arms still tied behind his back, left the residence in search of help. His neighbors, not aware of what had occurred, called the police to report a suspicious person. N.T. 8/24/17, pp. 54-68.

Officer Scott Patrick of the Middletown Township Police Department responded to the call and found Mr. Gray standing in the middle of the street, hands still bound behind his back, bleeding from his face, head and the back of his hands. N.T. 8/24/17, pp. 126-128. Mr. Gray told Officer Patrick that he had been robbed and that his wife was still inside the house. Mrs. Gray was taken from the house and her restraints were removed. The zip ties were secured so tightly, her wrists were bleeding and her hands were purple. N.T. 8/24/17, p. 129-30. Officer Patrick described the scene as being in total disarray. Every cabinet was open, beds were overturned and there were holes in the drywall. N.T. 8/24/17, p. 131; Exs. C-66 through C-74. Valuables, $4,500 in cash, Mr. Gray's fire company badge and numerous other items of

4

sentimental value had been taken. N.T. 8/24/17, pp. 70-71. Some of the items were later found in the residence of Christopher Upshur in Trenton. N.T. 8/24/17, pp. 215-216, 236-237.

James and Mary Orisack were in the business of buying and selling antique jewelry at the Columbus Flea Market in New Jersey. On September 21, 2012, police responded to a home invasion robbery at 304 Colonial Drive in Toms River, New Jersey and found the homeowners, James and Mary Orisack, inside the home, their wrists and ankles bound with wire ties. N.T. 8/24/17, pp. 200-201. The Orisacks reported that they were sleeping when three individuals woke them up at gunpoint, bound them and ransacked their home. Detective Roger Hull of the Toms River Township Police Department testified that every room in the house, including the garage, was ransacked; every drawer was opened, furniture was overturned and things were ripped off the walls. Approximately $100,000 in jewelry and $17,000 in cash was stolen during the burglary. The Orisacks reported that they had seen a Toyota parked near the residence earlier in the evening. N.T. 8/24/17, pp. 202-203.

During the period of time this group was operating, police stopped members of the ring on two occasions. The first stop occurred on August 16, 2012. On that date, Raymond Munn was stopped in New Jersey driving the Lexus stolen from Mrs. Harris' home. N.T. 8/23/17, pp. 182-184. Pillow cases filled with jewelry, laptops, a camera, bolt cutters, three sets of gloves, a pocket knife and a "walkie-talkie" were found inside the vehicle. Some, but not all, of these items belonged to Mrs. Harris. Although the Lexus was recovered, no other items of significance were returned to her. N.T. 8/23/17, pp. 111, 131-132; N.T. 8/24/17, pp. 138-141.

The second stop occurred on September 3, 2012, the date the Stone burglary was reported. On that date, three men in a red pickup truck appeared at the residence of Autumn Lucas and her boyfriend located at 835 River Road in Lower Makefield Township. One man got

5

out of the truck and knocked on the door. When her boyfriend opened the door, the man stated that their vehicle was overheating and they needed a gallon of water. Ms. Lucas found the explanation given for their presence suspicious due to the fact that her home was located far from the road and there were other homes nearby located close to the road. Ms. Lucas' suspicions were also aroused due to the fact that her home appeared to be unoccupied. There were no vehicles at the home, the shades were drawn and the exterior lights were on in the middle of the day. Ms. Lucas called 911, reported the incident and provided descriptions of the men and the vehicle. N.T. 8/24/17, pp. 4-11.

At 1:30 p.m., Officer David Kasprzyk of the Lower Makefield Township Police Department responded to the call of a suspicious vehicle. When he arrived in the area where the call originated, he observed a pickup truck matching the description given by the caller. N.T. 8/24/17, pp. 18-21. He stopped the truck and identified the occupants as the Defendant, Alex Lora and Chris Rodriguez. During this initial contact, he observed jewelry inside the cab of the truck. N.T. 8/24/17, pp. 22-26. After he removed the occupants from the truck, Officer Kasprzyk observed a pool cue converted into a club, a fifteen-inch-long flathead screwdriver and multiple gloves including a pair of work gloves with a textured, hard rubber studded grip inside the cab of the truck. N.T. 8/24/17, pp. 26-27, 37-39; Exs. C-55 through C-59. All three men were taken into custody on weapons charges. They were released a few days later. N.T. 8/24/17, p. 30. The vehicle was towed to police headquarters and was later searched pursuant to a search warrant. N.T. 8/24/17, p. 41. During the search, pillow cases full of jewelry and valuables from the Stone residence were found underneath scrap metal in the bed of the truck. N.T. 8/24/17, p. 267. Police also found three cell phones and two "walkie-talkie" type two-way radios. N.T. 8/24/17, p. 268; Ex. C-98.

6

Detective John Campbell of the Lower Makefield Township Police Department investigated the burglaries at the Carr, Zewe and Abramson residences. All three homes were located near major arteries which connect that area of Bucks County to Trenton, New Jersey. In all three cases, forcible entry had been made through a rear window of the home and the homes had been subjected to the same type of heavy ransacking. The same tool mark was found at each point of entry. N.T. 8/24/17, pp. 244-247. Detective Campbell examined the fifteen-inch flathead screwdriver and the gloves that had been seized from the red pickup truck. N.T. 8/24/17, pp. 249-250; Exs. C-58, C-59. The flathead screwdriver physically matched the pry marks found on the windows at the Stone, Zewe and Abramson residences. N.T. 8/24/17, pp. 256-257; Exs. C-88 through C-96. The dimple pattern on the gloves matched the glove print pattern found on windows at the Zewe and Abramson residences. N.T. 8/24/17, p. 251; Exs. C-84 through C-86. Detective Campbell also compared sneakers taken from Alex Lora on the day he was stopped in Lower Makefield with the footprint found at the scene of the Stone burglary. N.T. 8/24/17, pp. 262-265; Exs. C-76, C-97. The shoe print found at the Stone residence and the sole of the sneaker taken from Lora had the same distinctive pattern. N.T. 8/24/17, p. 265. Cell tower data placed the Defendant's phone in the area of the Zewe residence on the date that home was burglarized and in the area of the Abramson residence on the date that home was burglarized. N.T. 8/24/17, p. 275-277.

Detective Hull testified that a soft-sided laundry bag containing the Orisack's business cards and some other property that had been taken from their home was found on Cherry Street in Trenton near the residences of Christopher Upshur and Alex Lora. Mr. Orisack advised Detective Hull that he recently had business dealings with "Alex" and provided police with the telephone numbers he had for him. One of those phone numbers belonged to Christopher

7

Upshur. Christopher Upshur's mother was identified as Kathleen Mezaros. She resided with Alex Lora. N.T. 8/24/17, pp. 204-207. Trenton police searched Lora's residence and recovered property belonging to the Orisacks, specifically, pieces of mail, pieces of their safe, a bag of loose diamonds, a jewelry testing kit and handwritten tags for costume jewelry that matched the jewelry found on Cherry Street. N.T. 8/24/17, p. 209.

A Toyota matching the description of the vehicle seen at the Orisack residence was found at the residence of Christopher Upshur. The vehicle was registered to his mother, Kathleen Mezaros. A BMW with a temporary tag in the name of Kathleen Mezaros was also at Upshur's residence. Search warrants were obtained and the vehicles were searched. Inside the Toyota, police found a ski mask and a Tupperware lid. The police were aware that the individuals who had robbed the Orisacks wore ski masks and also that the Orisacks stored their jewelry in Tupperware containers. In addition, a shirt matching one worn by one of the individuals who had robbed the Orisacks was found in the BMW. N.T. 8/24/17, pp. 210-212.

A search warrant was also obtained for Upshur's residence. N.T. 8/24/17, pp. 212-214. During the search, police located and seized an Apple iPad, Apple Computer, a set of cufflinks with the initials "H.G.," and a Newtown fire badge, all of which were reported stolen in the Bucks County cases. Police also seized two jewelry boxes, one with a large amount of foreign coins, a television, a handgun, clothing and several video game consoles. N.T. 8/24/17, pp. 215-216. Two-way radios that matched the make and model and had consecutive serial numbers to the two-way radios found in the red pickup truck occupied by the Defendant, Alex Lora and Chris Rodriguez were also found. N.T. 8/24/17, pp. 215-217, 280-281, Ex. C-98.

Co-conspirator Raymond Munn was called as a Commonwealth witness. He testified that he knew the Defendant, Alex Lora, Chris Rodriguez and Christopher Upshur. He stated that

8

he, Alex Lora, and the Defendant discussed committing burglaries together in July of 2012 and immediately began committing burglaries in the area surrounding Trenton. Munn testified that the group committed "a couple" burglaries a day, about twice a week. All of the burglaries were committed during the day. Houses were selected based on apparent wealth. The house would be burglarized if no one was home. In the burglaries committed by Munn, Lora and Munn entered the homes and went directly to the master bedrooms in search of money and jewelry. They quickly ransacked the residences, placing any valuables they found in pillow cases or any other bags they found in the home. The Defendant acted as driver and lookout. The group used walkie-talkies to communicate with each other. The burglaries were committed in less than five minutes. The stolen property was sold at the Columbus Farmer's Market or pawned at Trenton pawnshops. The group split the proceeds. Munn specifically recalled participating in the July 30, 2012 burglary of the Harris residence. He testified that he saw keys to the Lexus and decided to take the car on his way out. N.T. 8/23/17, pp. 165-181.

Co-Conspirator Christopher Upshur was also called as a Commonwealth witness. He testified that in the summer of 2012, he, Munn, Rodriguez and the Defendant came up with a plan to make money by committing burglaries. He testified that not every conspirator was present at each burglary.[1] He admitted that he personally participated in approximately three burglaries in Pennsylvania. N.T. 8/24/17, pp. 83-85. His description of how the group operated was consistent with the description given by Munn. Upshur testified that the group approached a house and knocked hard on the front door to see if anyone answered. If someone answered, an

---

[1] Initially, Upshur testified he, Rodriguez and Munn were the only participants in the burglaries and home invasion and refused to implicate the Defendant. N.T. 8/24/17, pp. 95-96. After being confronted with prior inconsistent statements in which he implicated the Defendant, Upshur stated that his prior testimony that the Defendant was a member of the conspiracy and participated in the burglaries was truthful. N.T. 8/24/17, pp. 117-118.

9

excuse would be given for their presence and they would leave. If no one answered, forcible entry was made. On each occasion that he was present, Upshur entered and ransacked the homes, taking whatever items of value they found out of the house in pillow cases. N.T. 8/24/17, pp. 86-88. The stolen property was pawned in Trenton and the proceeds were divided. Upshur testified that even those conspirators who were not present received a share of the proceeds from each burglary in order "to look out for one another." N.T. 8/24/17, pp. 89-90. Upshur further testified that in August or September of 2012, the conspirators decided to "up [their] game." All of the conspirators agreed to rob Mr. and Mrs. Gray in their home at gunpoint. N.T. 8/24/17, pp. 89-91. Upshur testified that he and the Defendant participated in the armed robbery. He testified that three men entered the home, tied up the Grays using zip ties and ransacked the house. After "grabbing a few things and leaving," they returned to Upshur's home in Trenton. Every member of the conspiracy received a share of those proceeds. N.T. 8/24/17, pp. 93-96.

The final co-conspirator called as a Commonwealth witness was Chris Rodriguez who testified that he, the Defendant, Munn, Upshur and Lora decided to commit burglaries and discussed the role each of them would play. His description of how the group operated was consistent with the descriptions given by Munn and Upshur. He estimated that approximately five burglaries were committed in Pennsylvania by various members of the group. N.T. 8/24/17, pp. 168-178. He stated that on the day he, Lora and the Defendant were stopped in Lower Makefield, they had committed two burglaries and attempted a third. After they were released, they continued to commit burglaries in New Jersey and Pennsylvania. N.T. 8/24/17, pp. 179-183. Rodriguez, Lora, Upshur and the Defendant then discussed robbing Mr. and Mrs. Gray based on information from Lora that they would be able to get $200,000.[2] After following the

---

[2] Munn was incarcerated at this time and therefore did not participate. N.T. 8/24/17, p. 183.

Grays for a week, the group was satisfied they had identified where the Grays lived. N.T. 8/24/17, pp. 182-185. Rodriguez testified that he, Upshur and the Defendant committed the robbery and that he and Upshur were armed. Jewelry and $7000 to $8000 in cash was taken during the robbery. N.T. 8/24/17, pp. 185-188.

The Commonwealth charged the Defendant with all of the offenses committed in Bucks County in a single information pursuant to Rule 563 of the Pennsylvania Rules of Criminal Procedure which provides:

> (A) Two or more offenses, of any grade, may be charged in the same information if:
>> (1) the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion; or
>> (2) the offenses charged are based on the same act or transaction.

Pa.R.Crim.P. 563. The Defendant filed a motion to sever the robbery from the remaining charges. Rule 583 provides:

> The court may order separate trials of offenses or defendants, or provide other appropriate relief, if it appears that any party may be prejudiced by offenses or defendants being tried together.

Pa.R.Crim.P. 583. That motion was denied on August 22, 2017. The Defendant challenges that ruling on appeal.

In the instant case, the Defendant was charged with Corrupt Organizations. The Corrupt Organizations statute provides:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity in which such person participated as a principal, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in the acquisition of any interest in, or the establishment or operation of, any enterprise....

11

18 Pa.C.S. §911. "Pattern of racketeering activity" is defined as "a course of conduct requiring two or more acts of racketeering activity." 18 Pa.C.S. §911(h)(4). The crimes of Robbery and Theft constitute "racketeering activity" under the statute. 18 Pa.C.S. §911(h)(1)(i). Here, the Commonwealth alleged that the robbery of the Grays was an act of racketeering. "Where proof of an offense with which a defendant is charged requires proof of another crime or wrong, evidence of the other crime or wrong is necessarily admissible." Commonwealth v. Johnson, 160 A.3d 127, 144-45 (Pa.2017)). The Defendant's motion to sever the robbery was therefore properly denied since evidence of the robbery was necessary to establish an element of the Corrupt Organizations charge.

Similarly, the Commonwealth charged the Defendant with engaging in an ongoing conspiracy to carry out burglaries of unoccupied and occupied residences. To sustain a conviction for Criminal Conspiracy, the Commonwealth was required to establish that the Defendant: (1) entered into an agreement to commit or aid in an unlawful act with another person or persons; (2) with a shared criminal intent and; (3) an overt act was done in furtherance of the conspiracy. Commonwealth v. Fisher, 80 A.3d 1186, 1190-1191 (Pa.2013) (internal quotations, citations, and corrections omitted); see also 18 Pa.C.S. §903. An "overt act" means an act done in furtherance of the object of the conspiracy. Commonwealth v. Gross, 101 A.3d 28, 34 (Pa.2014); see 18 Pa.C.S. §903(e). If a person conspires to commit a number of crimes, he is guilty of only one conspiracy so long as such multiple crimes are the object of the same agreement or continuous conspiratorial relationship. 18 Pa.C.S. §903(c). In the instant case, the robbery of Mr. and Mrs. Gray in their home constituted an overt act done in furtherance of the continuous conspiratorial relationship that existed among the named conspirators. The

12

Defendant's motion to sever the robbery charge was therefore properly denied since the robbery was admissible to establish an element of Criminal Conspiracy.

If the robbery is not deemed to be part of the same act or transaction, the following inquiries must be made:

> [W]hether the evidence of each of the offenses would be admissible in a separate trial for the other; whether such evidence is capable of separation by the jury so as to avoid danger of confusion; and, if the answers to these inquiries are in the affirmative, whether the defendant will be unduly prejudiced by the consolidation of offenses.

Commonwealth v. Torres, 177 A.3d 263, 277 (Pa.Super.2017) (quoting Commonwealth v. Thomas, 879 A.2d 246, 260 (Pa.Super.2005)); see Pa.R.Crim.P 523 and 583. It is well established that "proofs of distinct crimes" is admissible "to show a common plan, scheme or design embracing commission of multiple crimes, or to establish the identity of the perpetrator, so long as proof of one crime tends to prove the others." Commonwealth v. Cousar, 928 A.2d 1025, 1037 (Pa.2007) (quoting Commonwealth v. Keaton, 729 A.2d 529, 537 (Pa.1999) (quotation marks omitted).

In this case, evidence of the robbery of the Grays in their home would be admissible in a separate trial of the other burglaries and vice versa to establish common plan, scheme and design and, therefore, the identity of the perpetrators in all of the burglaries. As the facts set forth above demonstrate, the burglaries were committed close in time and in the same vicinity. The group operated in a highly organized fashion, targeting homeowners they believed would possess large amounts of cash and valuables that could easily be converted into cash, i.e. jewelry. All of the crimes were conducted methodically, with speed and precision. The perpetrators utilized the quickest and surest means of finding all items of value by quickly emptying all receptacles where such items may have been stored or hidden; drawers were removed and overturned and closets

13

were emptied. The only distinction between the offenses committed by the members of this organization was the fact that on two occasions the group targeted occupied residences. That however does not undermine the fact that these were signature crimes. The difference between their invasions of unoccupied homes and their invasion of occupied homes only demonstrates the natural evolution of the group and an increased willingness to take greater risks in exchange for greater reward. Moreover, the evidence relating to the Gray burglary/robbery and the other burglaries was clearly capable of separation by the jury so that there was no danger of confusion. While all of the burglaries were related, each was a distinct event. Finally, the Defendant suffered no undue prejudice given the amount and weight of the evidence connecting him to each of the crimes charged.

The Defendant next challenges this Court's denial of his motion to suppress the traffic stop of the red pickup truck in Lower Makefield Township on September 3, 2012 and the subsequent search of the cab of that vehicle.[3] The evidence introduced at the suppression hearing established that prior to the challenged car stop, Officer David Kasprzyk of the Lower Makefield Township Police Department had received information from his department's detective division that a rash of burglaries had occurred in Lower Makefield Township and surrounding jurisdictions. N.T. 8/22/17, pp. 33-34. All of the burglaries occurred during daytime hours and involved residences located close one another and close to the Pennsylvania – Trenton, New Jersey border. N.T. 8/22/17, pp. 34-35. As a result of this information, in addition to his normal duties, Officer Kasprzyk was on the lookout for suspicious vehicles in residential neighborhoods. N.T. 8/22/17, pp. 33-34.

---

[3] This Court's findings of fact and conclusions of law with regard to this issue are set forth at N.T. 8/25/17, pp. 2-20.

14

On September 3, 2012, Officer Kasprzyk was on routine patrol. N.T. 8/22/17, pp. 32-33. At approximately 1:30 p.m., he received a call of a suspicious vehicle. The complainant had called from an address on River Road, in the immediate vicinity of where other burglaries had occurred. The suspicious vehicle was described as a red pickup truck with New Jersey license plates. The complainant reported the vehicle had three male occupants and that one of the occupants had approached her house and knocked on the door. N.T. 8/22/17, pp. 36-39. She stated that she found the fact that these individuals approached her home to be suspicious due to the fact that her home was set back far from the road and the home would have appeared to be unoccupied since the shades were drawn, no vehicles were in the driveway and the exterior lights were on in the middle of the day. N.T. 8/22/17, pp. 37-38.

Officer Kasprzyk immediately responded to the area and within minutes observed a vehicle matching the complainant's description within three-quarters of a mile of the complainant's address. N.T. 8/22/17, pp. 39-40. Officer Kasprzyk observed the vehicle make a turn without using a turn signal. N.T. 8/22/17, p. 58. He also observed an unsecured load of scrap in the bed of the truck. N.T. 8/22/17, pp. 47, 54-55; Exs. CP-1 through CP-3. After making these observations, Officer Kasprzyk stopped the vehicle.

Prior to approaching the vehicle, Officer Kasprzyk observed three occupants inside the cab of the truck. All three occupants were making furtive movements, reaching down towards the floor of the cab causing the officer to lose sight of all three men at times. Officer Kasprzyk called for backup and approached the vehicle. N.T. 8/22/17, pp. 40-42. As he approached, all three individuals continued their furtive movements. When he got to the cab of the truck, Officer Kasprzyk instructed the occupants to stop moving. N.T. 8/22/17, p. 44.

15

The driver of the truck was identified as Oliver Cabrera, the Defendant. The individual seated next to him was identified as Chris Rodriguez, the individual seated next to him was identified as Alexander Lora. N.T. 8/22/17, p. 42-43. Officer Kasprzyk asked for vehicle registration and proof of insurance. The Defendant advised the officer that he did not have the requested documentation. He stated that the vehicle was owned by his girlfriend. N.T. 8/22/17, p. 45. Looking into the vehicle, Officer Kasprzyk could see that there was no key in the turn-key ignition although the vehicle was still running. N.T. 8/22/17, p. 46. He also saw women's jewelry in a compartment on the dash of the vehicle. N.T. 8/22/17, pp. 47, 49; Exs. CP-2, CP-3.

When backup officers arrived, the occupants were removed from the vehicle. N.T. 8/22/17, pp. 45-46, 47-48. Officer Kasprzyk then observed, in plain view, a handle of a pool cue with a lanyard attached sticking out from under the seat of the truck. N.T. 8/22/17, p. 48. On the floor of the cab, in plain view, were pills, a fifteen inch flathead screwdriver and gloves with rubber textured finger/hand grips. N.T. 8/22/17, pp. 49-50. Police seized the items they observed in plain view and conducted a cursory search of the cab of the vehicle for weapons. N.T. 8/22/17, pp. 47-48. Once the pool cue and been removed from under the seat, it became clear that it had been converted into a club to be used as a weapon. N.T. 8/22/17, p. 4. Other than the screwdriver, no other tools were found in the truck. N.T. 8/22/17, p. 49.

The Defendant, Rodriguez and Lora were taken into custody for possession of a prohibited offensive weapon and possession of a controlled substance. N.T. 8/22/17, p. 50. The pickup truck was towed to headquarters and a search warrant was obtained. N.T. 8/22/17, p. 51. When the search warrant was executed, police found a number of items concealed under the scrap in in the bed of the truck, including pillow cases, jewelry, household items and other valuables. N.T. 8/22/17, p. 51.

16

The Fourth Amendment of the Federal Constitution provides, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated..." U.S. Const. amend. IV. Article I, Section 8 of the Pennsylvania Constitution states, "[t]he people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures..." Pa. Const. Art. I, §8. A defendant moving to suppress evidence seized during the course of a search has the preliminary burden of establishing standing, *i.e.* a legitimate expectation of privacy in the area searched. Commonwealth v. Burton, 973 A.2d 428, 435 (Pa.Super.2009) *(en banc)*. Although standing was not raised as an issue at the time of the suppression hearing, a review of the record establishes that the Defendant failed to establish that he had a reasonable expectation of privacy in the pickup truck that was the subject of the challenged search. The only evidence introduced at the suppression hearing regarding the Defendant's interest in the truck came from Officer Kasprzyk who testified that the Defendant told him that his girlfriend owned the truck. He did not have registration or insurance documents for the truck and was operating the truck without the ignition key. N.T. 8/22/17, 45-46. Officer Kasprzyk confirmed that the registered owner of the vehicle was Kathleen Mezaros. N.T. 8/22/17, pp. 61-62. There was no evidence that the Defendant had permission to drive or otherwise use that vehicle from Ms. Mezaros or from any other person authorized to give such permission.

If a defendant does not own the vehicle that is subject to the search, he must establish that the registered owner gave him permission to use the vehicle in order to establish a reasonable expectation of privacy in that vehicle. The only evidence regarding the Defendant's use of the vehicle was the Defendant's statement at the time of the stop that the truck was owned by his girlfriend. The mere fact that a vehicle is owned by a defendant's girlfriend is insufficient to

17

establish a reasonable expectation of privacy in that vehicle. In <u>Commonwealth v. Maldonado</u>, 14 A.3d 907, 911 (2011), the court stated,

> The fact that Maldonado and Vasquez [the owner of the vehicle] might have lived together and had a romantic relationship does not foreclose the possibility that Maldonado was driving Vasquez's vehicle without her knowledge or permission. For that reason, we conclude that Maldonado failed to establish an expectation of privacy in the vehicle he was driving, which "he did not own, that was not registered to him, and for which he has not shown authority to operate."

Here, the Defendant failed to establish that he had a reasonable expectation of privacy in the pickup truck. He therefore had no standing to challenge the search of that truck.

In any case, this Court found that the seizure of the various items at the scene of the vehicle stop was proper. There are three levels of intrusion in interactions between members of the public and the police.

> The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or respond. The second, an "investigative detention" must be supported by reasonable suspicion; it subjects a suspect to a stop and period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

<u>Commonwealth v. Ellis</u>, 662 A.2d 1043, 1047 (Pa.1995) (citations and footnote omitted).

Here, this Court found that the stop was an "investigatory detention" that was supported by reasonable suspicion. Officer Kasprzyk was dispatched for a report of a suspicious vehicle at a residence on River Road in Lower Makefield Township. The suspicious vehicle was described as a red pickup truck with three occupants and a New Jersey license plate. The conduct of the occupants was clearly suspicious. They were allegedly in search of water for their overheated vehicle but chose to approach a home that was situated far from the road and that appeared to be unoccupied. At the time he received this information, Officer Kasprzyk was aware that other

18

residential burglaries had occurred on River Road, in the immediate vicinity to where the call originated. He knew that the homes had been completely ransacked and that jewelry and other valuables had been stolen. He was aware that each of the homes had been burglarized during daytime hours and that the burglaries were connected since they had been committed in the same unique fashion. And finally, he was aware that the caller's residence and the homes that had been burglarized were all in the immediate vicinity of the Township's border with Trenton, New Jersey where similar burglaries were occurring. N.T. 8/22/17, pp. 33-39. Based on these facts and circumstances and the reasonable inferences that arise from those facts and circumstances, Officer Kasprzyk clearly had sufficient cause to conduct an investigatory detention when, within minutes of the call, he observed the vehicle the caller had described bearing New Jersey tags within three quarters of a mile of the caller's home. N.T. 8/22/17, p. 40.

Officer Kasprzyk was also entitled to stop the truck for vehicle code violations. He had observed a turn signal violation in violation of Section 3334 of the Vehicle Code. 75 Pa.C.S. §3334. Because no further investigation was required to establish the turn signal violation, Officer Kasprzyk was required to have probable cause to initiate the stop. Commonwealth v. Brown, 64 A.3d 1101, 1105 (Pa.Super.2013). Here, the officer's first hand observation of the Defendant's failure to use his turn signal was sufficient to establish probable cause to stop the vehicle for a violation of Section 3334. Id.

In addition, Officer Kasprzyk had observed a violation of Section 4903 of the Vehicle Code which prohibits a vehicle from being driven on any highway unless it is loaded to "prevent any of its load from dropping, sifting, leaking or otherwise escaping," and requires "[e]very load on a vehicle shall be fastened so as to prevent the load or covering from becoming loose, detached or in any manner a hazard to other users of the highway." 75 Pa.C.S. §4903(a), (b).

19

Officer Kasprzyk testimony and the photographs of the vehicle established that the bed of the vehicle was filled with "a mound" of loose objects, some of which extended over the top and sides of the truck bed. N.T. 8/22/17, pp. 47, 54-55; Exs. CP-1, CP-2. The officer's first hand observations were sufficient to establish probable cause to stop the vehicle for a violation of 75 Pa.C.S. §4903(b).

If further investigation of the potential violation was needed, Officer Kasprzyk was still entitled to stop the vehicle. A police officer is permitted by statute to conduct a vehicle stop if he has reasonable suspicion to believe that a violation of the Motor Vehicle Code is occurring or has occurred. Commonwealth v. Holmes, 14 A.3d 89, 95 (Pa. 2011); 75 Pa.C.S. §6308(b). It is axiomatic that to establish reasonable suspicion, an officer "must be able to articulate something more than an inchoate and particularized suspicion or hunch." Commonwealth v. Williams, 125 A.3d 425, 432 (Pa.Super.2015). To establish reasonable suspicion in the vehicle stop context, "an officer must be able to point to specific and articulable facts which led him to reasonably suspect a violation of the Motor Vehicle Code." Id. (emphasis omitted). The test of whether an officer had reasonable suspicion is objective and reviewed from the standpoint of an objectively reasonable police officer, according to the totality of the circumstances. Id. at 96. Here, the officer's first hand observations of the unsecured load in the bed of the truck was clearly sufficient to establish reasonable suspicion that a violation of 75 Pa.C.S. §4903(b) was occurring.

Once the vehicle was properly stopped, Officer Kasprzyk was permitted to have the occupants step out of the truck. "[I]t is well-established that when an officer detains a vehicle for violation of a traffic law, it is inherently reasonable that he or she be concerned with safety and, as a result, may order the occupants of the vehicle to alight from the car." Commonwealth v. Harris, 176 A.3d 1009, 1020-21 (Pa.Super.2017) (quotation marks omitted). Once the occupants

20

had been lawfully removed from the vehicle, Officer Kasprzyk observed a makeshift weapon in plain view. The officer's subsequent seizure of the makeshift club was permissible under the "plain view doctrine" which allows a warrantless seizure item where:

> (1) the police have not violated the Fourth Amendment in arriving at the location from which the item could be viewed; (2) the item is in plain view; (3) the incriminating character of the item is immediately apparent; and (4) the police have a lawful right of access to the item itself.

Commonwealth v. Jones, 988 A.2d 649, 656 (Pa. 2010).

In addition, Officer Kasprzyk was justified in conducting a limited search for weapons and, therefore, were entitled to search the cab interior. "[A]n officer has the right to conduct a weapons search of an automobile if there is a reasonable belief that the suspect is dangerous and that the suspect might gain immediate control of weapons." Commonwealth v. Boyd, 17 A.3d 1274, 1277 (Pa.Super.2011). Here, Officer Kasprzyk was responding to a call of a suspicious vehicle that had approached a residence in a neighborhood where burglaries were occurring. Those burglaries were part of a larger burglary spree which were occurring in New Jersey and Bucks County. Upon stopping the vehicle, the officer observed all three occupants reaching down toward the floor of the vehicle. All three continued these movements as he approached the truck. The vehicle was being operated without an ignition key and none of the occupants produced registration or insurance documents for the vehicle. Once the occupants were outside the vehicle, Officer Kasprzyk saw what appeared to be a home-made weapon on the floor of the truck. Under these circumstances, Officer Kasprzyk reasonably concluded that the occupants posed a danger to himself and others and therefore was permitted to conduct a limited search of the cab of the truck for weapons in any area where the occupants of the vehicle may have reached. Commonwealth v. Morris, 644 A.2d 721, 723 (Pa.1994) ("[A]n officer could conduct a warrantless search of those portions of the passenger compartment of a vehicle in which a

21

weapon could be hidden when the circumstances were such that a reasonably prudent man in the circumstances would be warranted in the belief that his safety or the safety of the others was in danger, so long as this belief was based on specific articulable facts.") (quotation marks omitted).

Similarly, seizure of the screwdriver, gloves and women's jewelry was also permitted under the plain view doctrine. Commonwealth v. Jones, supra. The officer was lawfully in a position to see the items, the items were in plain view and their incriminating nature was apparent. The items, considered together and considered in the light of the surrounding circumstances, were clearly the tools and proceeds of a burglary or burglaries. Seizure of the items at the scene of the stop was therefore permissible.

Finally, assuming *arguendo* that the search of the truck at the time of the stop was illegal, the Defendant is still not entitled to relief. Illegally seized evidence is admissible at trial under the inevitable discovery doctrine where the Commonwealth demonstrates by a preponderance of the evidence that the illegally obtained evidence inevitably would have been discovered through lawful means. Commonwealth v. Bailey, 986 A.2d 860, 862 (Pa.Super.2009). Here, the club, jewelry, screwdriver and gloves would have been discovered during the execution of the search warrant for the truck, the validity of which is unchallenged. The evidence was therefore properly admitted at trial. See, Commonwealth v. Anderson, 40 A.3d 1245, 1249 (Pa.Super.2012) (drug evidence improperly seized was admissible under the inevitable discovery doctrine since the evidence would have been discovered during valid search).

The Defendant next challenges the admission of evidence regarding the burglary and robbery that occurred at the residence of Mr. and Mrs. Orisack in Toms River, New Jersey on the grounds that the evidence constituted improper character evidence in violation of Rule 404(b) of the Rules of Evidence. This Court found that the evidence did not constitute evidence of other

crimes under Rule 404(b) but rather was admissible to establish the crime of Corrupt Organizations and was part of the ongoing Criminal Conspiracy with which the Defendant was charged.

As previous explained, the Commonwealth was required to establish "pattern of racketeering activity" which is defined as "a course of conduct requiring two or more acts of racketeering activity" in order to convict the Defendant of Corrupt Organizations. 18 Pa.C.S. §911(h)(4). The crimes of Robbery and Theft constitute "racketeering activity" under the Corrupt Organizations statute. 18 Pa.C.S. §911(h)(1)(i). Here, the robbery and theft that occurred at the Orisack's residence were properly admitted to establish racketeering activity. The offenses were also committed pursuant to an ongoing criminal conspiracy and were therefore properly admitted to prove the Criminal Conspiracy charge. "Where proof of an offense with which a defendant is charged requires proof of another crime or wrong, evidence of the other crime or wrong is necessarily admissible." Commonwealth v. Johnson, cited above at 144-45.

The Orisack burglary/robbery was also admissible to prove the identity of the perpetrators of the Gray burglary/robbery. It is well settled that, "[w]hile proofs concerning distinct crimes is inadmissible solely to demonstrate a defendant's bad character or his propensity to commit crimes... such evidence is permitted 'to show a common plan, scheme or design embracing commission of multiple crimes, or to establish the identity of the perpetrator, so long as proof of one crime tends to prove the others.'" Commonwealth v. Cousar, cited above at 1037. "Evidence of another crime is admissible where the conduct at issue is so closely related that proof of one criminal act tends to prove the other." Commonwealth v. Natividad, 773 A.2d 167, 174 (Pa.2001), abrogated on other grounds by Commonwealth v. Freeman, 827 A.2d 385

23

(Pa.2003). "Such evidence is particularly relevant to prove identity." Id.

The similarity between the Orisack and Gray home invasion robberies was sufficient to satisfy the common plan, scheme and design exception to the rule excluding evidence of other bad acts. The victims were chosen because they sold items at flea markets and dealt in cash proceeds. Both of the homes were staked out ahead of time. Each burglary/robbery involved elderly couples and occurred at night. In each, three members of the group entered the home, bound the victims and went from room to room, ransacking the house. In both incidents, firearms were used. In both, the participating conspirators left the couple tied up inside their home and fled to Trenton to divide the proceeds. N.T. 8/22/17, pp. 5-7.

The Defendant next argues that his sentence was excessive. A challenge to an alleged excessive sentence is a challenge to the discretionary aspects of a sentence. Commonwealth v. Ahmad, 961 A.2d 884, 886 (Pa.Super.2008). To preserve a challenge to the discretionary aspects of a sentence for appellate review, the claim must be raised during the sentencing proceedings or in a post-sentence motion. Commonwealth v. Heaster, 2017 PA Super 298, 171 A.3d 268 (2017). The Defendant failed to raise the claim that the sentence imposed was excessive at the time of sentencing and in his motion for reconsideration of sentence. The claim is therefore waived.

The Defendant's claim also lacks substantive merit. The standard of review applicable to a challenge to the discretionary aspects of sentence is well settled. A sentence will not be overturned unless the record shows a manifest abuse of discretion, which is more than mere error in judgment. Commonwealth v. Caldwell, 117 A.3d 763, 768 (Pa.Super.2015). A defendant must establish that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will or arrived at a manifestly unreasonable decision.

24

Id. The decision of the sentencing judge should be given great deference since he or she is in the best position to view the defendant and evaluate the individual circumstances of the case. Commonwealth v. Walls, 926 A.2d 957 (Pa.2007).

As the Court in Walls explained,

> The rationale behind such broad discretion and the concomitantly deferential standard of appellate review is that the sentencing court is "in the best position to determine the proper penalty for a particular offense based upon an evaluation of the individual circumstances before it." Commonwealth v. Ward, 524 Pa. 48, 568 A.2d 1242, 1243 (1990); see also Commonwealth v. Jones, 418 Pa.Super. 93, 613 A.2d 587, 591 (1992) (en banc) (offering that the sentencing court is in a superior position to "view the defendant's character, displays of remorse, defiance or indifference and the overall effect and nature of the crime."). Simply stated, the sentencing court sentences flesh-and-blood defendants and the nuances of sentencing decisions are difficult to gauge from the cold transcript used upon appellate review. Moreover, the sentencing court enjoys an institutional advantage to appellate review, bringing to its decisions an expertise, experience, and judgment that should not be lightly disturbed. Even with the advent of the sentencing guidelines, the power of sentencing is a function to be performed by the sentencing court. Ward, 568 A.2d at 1243. Thus, rather than cabin the exercise of a sentencing court's discretion, the guidelines merely inform the sentencing decision. See also United States v. Salinas, 365 F.3d 582, 588 (7th Cir.2004).

Id. at 961-962 (footnotes omitted).

When imposing a sentence, a court must consider the factors set forth in 42 Pa.C.S. §9721(b). Specifically, the court is required to consider the protection of the public, the gravity of the offense as it relates to the impact on the victim and the community, the defendant's rehabilitative needs and the sentencing guidelines. 42 Pa.C.S. §9721(b). As to the sentencing guidelines, the court in Walls reaffirmed that the guidelines "have no binding effect, create no presumption in sentencing, and do not predominate over other sentencing factors – they are advisory guideposts that are valuable, may provide an essential starting point, and that must be

25

respected and considered; they recommend, however, rather than require a particular sentence." Walls, 926 A.2d at 964-965. Where the sentence imposed is within the sentencing guidelines, the sentence must be affirmed unless an appellate court finds "the case involves circumstances where the application of the guidelines would be *clearly unreasonable*." 42 Pa.C.S. §9781(c)(2) (emphasis added). Where the sentence imposed exceeds the sentencing guidelines, the sentence is reviewed to determine if it is *"unreasonable."* Walls, 926 A.2d at 963; 42 Pa.C.S. §9781(c)(3). The parameters of that inquiry were explained as follows:

> ...we decline to fashion any concrete rules as to the unreasonableness inquiry for a sentence that falls outside of applicable guidelines under Section 9781(c)(3). We are of the view, however, that the Legislature intended that considerations found in Section 9721 inform appellate review for unreasonableness. That is, while a sentence may be found to be unreasonable after review of Section 9781 (d)'s four statutory factors, in addition a sentence may also be unreasonable if the appellate court finds that the sentence was imposed without express or implicit consideration by the sentencing court of the general standards applicable to sentencing found in Section 9721, i.e., the protection of the public; the gravity of the offense in relation to the impact on the victim and the community; and the rehabilitative needs of the defendant. 42 Pa.C.S. § 9721(b).

Id. at 963-964. The existence of a pre-sentence report creates a presumption that the sentencing court was aware of the relevant information regarding the Defendant's character and weighed those considerations along with mitigating statutory factors. Commonwealth v. Devers, 546 A.2d 12, 18 (Pa.1988).

In the instant case, the following sentences were imposed:

> Burglary of the Harris residence on July 30, 2012:  14 to 28 months;
> Burglary of the Carr residence on August 8, 2012:  14 to 28 months;
> Burglary of the Zewe residence on August 21, 2012:  14 to 28 months;

26

Burglary of the Abramson residence on September 1, 2012: 14 to
    28 months;
Burglary of the Stone residence on September 3, 2012: 14 to 28
    months.
Robbery of Rebecca and Harvey Gray on September 10, 2012: 60
    to 120 months;
Burglary of the Gray residence on September 10, 2012: 24 months
    to 48 months.

These sentences were imposed consecutive to one another. N.T. 11/28/17, pp. 35-39. For the

crime of Corrupt Organizations, the Defendant was sentenced to a term of probation of 20 years

to run concurrent to the sentences of incarceration.[4] N.T. 11/28/12, pp. 40, 46.

The sentences imposed on the Burglary convictions were within the standard range of the

sentencing guidelines.[5] Therefore, the only issue as to the sentences imposed for these crimes is

whether "the case involves circumstances where the application of the guidelines would be

*clearly unreasonable*." 42 Pa.C.S. § 9781(c)(2) (emphasis added). The sentence imposed on the

Robbery conviction exceeded the sentencing guidelines.[6] The issue is therefore whether the

sentence imposed is "*unreasonable*." Walls, 926 A.2d at 963; 42 Pa.C.S. §9781(c)(3).

In imposing these sentences, this Court considered all of the factors set forth in the

Sentencing Code, *i.e.*, the gravity of the offense in relation to the impact on the victim and the

community; and the rehabilitative needs of the Defendant. N.T. 11/28/17, pp. 16-36. The crimes

---

[4] The sentence imposed for Corrupt Organizations was below the mitigated range of the sentencing guidelines. The guidelines called for: mitigated – 12 months; standard – 21-28 months; aggravated – 37 months.

[5] The guidelines for Burglary of the unoccupied residences (*i.e.*, the Harris, Carr, Zewe, Abramson and Stone residences) called for: mitigated – RS; standard – 6 to 14 months; aggravated – 20 months. The guidelines for Burglary of an occupied residence (*i.e.*, the Gray residence) called for: mitigated – RS; standard – 12 to 24 months; aggravated – 36 months.

[6] The guidelines for Robbery called for: mitigated – 6 months; standard – 12 to 20 months; aggravated – 26 months. The guideline ranges set forth in the Presentence Investigation Report and utilized by the Court for the crime of Robbery were incorrect. The guidelines reflected an Offense Gravity Score for Robbery-(inflicting serious bodily injury), 18 Pa.C.S. §3701(a)(1)(i). However, demurrer was granted as to that offense and the lesser included offense of Robbery (inflicting bodily injury), 18 Pa.C.S. §3701(a)(1)(iv), was submitted to the jury. The resulting change in the guidelines does not alter this Court's view as to the appropriate sentence for this conviction. It was this Court's intention to impose a minimum sentence of five years based on the facts and circumstances of this case.

themselves were sophisticated, well planned and carried out with speed and precision. To avoid suspicion as they drove through residential neighborhoods looking for homes to burglarize, the conspirators used the necessary props to blend into the neighborhood, appearing to be yard workers or handymen. Once a home was selected and determined to be unoccupied, they acted quickly, ransacking the home and removing portable valuables in bags taken from inside the residence. Communication was maintained by the use of two-way radios. The burglaries were committed in less than five minutes to reduce the risk of apprehension.

The gravity of the offenses as related to the impact on the community was also noted. The Defendant and his co-conspirators created an organization designed to prey on the community, relentlessly and violently, without justification or excuse. They did so for the sole purpose of making easy money. The areas affected in that part of Bucks County and in adjoining areas in New Jersey, were subjected to a crime spree of felonies, undermining their ability to feel safe and secure in their own homes. Handguns that had been taken during the burglaries are now presumably on the street. The victims collectively suffered property loss $84,136.96. More importantly, they lost items of sentimental value that are irreplaceable. Even after law enforcement intervened on September 3, 2012, the organization's criminal activity did not abate, in fact, it escalated. Unsatisfied with the money they were making by committing daytime burglaries of unoccupied residences, the group targeted specific individuals they believed would have large amounts of cash and jewelry in their homes. They began to enter homes armed, binding and terrorizing the homeowners and forcing them to turn over their money and other valuables. In addition to removing drawers and throwing personal belongings on the floor in their search for valuables, the participants tore down drywall looking for hidden valuables. This Court specifically commented on the violence and cruelty of the crimes inflicted upon the Grays.

28

These victims were seniors who the Defendant had no reason to believe could survive the type of physical and mental mistreatment they were subjected to at the hands of the Defendant and his co-conspirators. One victim told the Court, "They were surprised they survived. They were ready to die." N.T. 11/28/17, p. 30.

Under the facts and circumstances of this case, a sentence for each burglary within the standard range of the sentencing guidelines cannot be deemed *"clearly unreasonable."* 42 Pa.C.S. §9781(c)(2) (emphasis added). A sentence outside the sentencing guidelines for the charge of Robbery cannot be deemed *"unreasonable."* 42 Pa.C.S. §9781(c)(3) (emphasis added). The fact that the sentences of incarceration were imposed to run consecutively does not alter that conclusion. These were separate felony offenses, committed on different dates, against different victims, which caused unique, particularized harm. Separate and distinct felony offenses which cause separate and distinct harms call for imposition of separate and distinct sentences. See Commonwealth v. Swope, 123 A.3d 333, 341 (Pa.Super.2015) (citation omitted) ("Appellant is not entitled to a volume discount for his crimes.").

In his final allegation of error, the Defendant asserts the evidence was insufficient to sustain a criminal conviction on all charges. The standards for evaluating the sufficiency of the evidence are well established. Where the evidence admitted at trial, and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict-winner, are sufficient to enable the factfinder to conclude that the Commonwealth established all of the elements of the offense beyond a reasonable doubt, there is sufficient evidence to sustain a conviction. Commonwealth v. Martin, 101 A.3d 706, 718 (Pa. 2014) cert. denied Martin v. Pennsylvania, 136 S. Ct. 201, 193 L. Ed. 2d 155 (2015). The Commonwealth may sustain its burden of proof by means of wholly circumstantial evidence. Id. Moreover, the evidence need

29

not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the factfinder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. Commonwealth v. Gooding, 818 A.2d 546, 549 (Pa.Super.2003). In determining the credibility of witnesses and the weight of the evidence, the finder of fact is free to believe all, part or none of the evidence. Commonwealth v. Martin, supra.

In his statement of matters complained of on appeal, the Defendant has failed to identify which elements of which charges the Commonwealth has failed to prove. A Rule 1925(b) statement must state with specificity the element or elements upon which the appellant alleges that the evidence was insufficient. Commonwealth v. Stiles, 143 A.3d 968, 982 (Pa.Super.2016), appeal denied sub nom. Commonwealth v. Stiles, 163 A.3d 403 (Pa. 2016). A failure to do so risks waiver of the issue. Id. In Commonwealth v. Freeman, 128 A.3d 1231, 1247-1248 (Pa.Super.2015), the court found that the appellant's claim that "the evidence at trial was insufficient to sustain a conviction of the crimes charged" was too vague to warrant meaningful review and therefore held that the appellant waived that claim. Id. at 1247-1248. In doing so, the Court stated,

> The Pennsylvania Supreme Court has explained that Rule 1925 is a crucial component of the appellate process, which "is intended to aid trial judges in identifying and focusing upon those issues which the parties plan to raise on appeal." Commonwealth v. Lord, 553 Pa. 415, 719 A.2d 306, 308 (1998). "When an appellant fails adequately to identify in a concise manner the issues sought to be pursued on appeal, the trial court is impeded in its preparation of a legal analysis which is pertinent to those issues." In re Estate of Daubert, 757 A.2d 962, 963 (Pa.Super.2000). "In other words, a Concise Statement which is too vague to allow the court to identify the issues raised on appeal is the functional equivalent of no Concise Statement at all." Commonwealth v. Dowling, 778 A.2d 683, 686 (Pa.Super.2001).

30

Id. at 1248. In the instant case, twenty-nine separate criminal offenses were submitted to the jury. The Defendant's bald allegation of insufficiency without specifying which element or elements of the relevant crimes the Commonwealth failed to prove is too vague to allow this Court to identify the issue raised and therefore cannot support a claim for relief.

The only claims this Court can address are those claims raised by the Defendant at the close of the Commonwealth's case. At that time, the Defendant demurred to the charge of Corrupt Organizations arguing that there was no testimony that the Defendant received any money or that the funds were reinvested in the criminal organization. N.T. 8/25/17, pp. 21-22. As to the Burglary charges, the Defendant asserted there was no evidence as to which houses the Defendant entered. N.T. 8/25/17, pp. 21-23.

The crime of corrupt organizations is codified at Section 911 of the Crimes Code, which provides, in relevant part:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity in which such person participated as a principal, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in the acquisition of any interest in, or the establishment or operation of, any enterprise.

18 Pa.C.S. §911(b)(1). The Defendant's assertion that there was no evidence that he received any of the proceeds of the burglaries is belied by the record. Co-conspirators Raymond Munn, Christopher Upshur and Chris Rodriguez all testified that the proceeds of the burglaries were distributed among the group and identified the Defendant as a member of that group. The element that the Defendant received income from the racketeering activity was therefore established. His claim that there was no evidence that funds were reinvested into the organization is also belied by the record. In dividing proceeds, members of the organization received a share whether or not they participated in a specific burglary, so as "to look out for one another." N.T.

31

8/24/17, p. 89. Based on this evidence, the jury could reasonably find that the organization used its income to maintain its membership and thus continue its operations. The element that the Defendant directly or indirectly reinvest in the enterprise was therefore established.

With regard to the Burglary convictions, while the evidence did not place the defendant at the scene of each burglary, the evidence clearly established that he was a member of an ongoing conspiracy that came together to commit residential burglaries. A conspiracy is established where, "The defendant entered an agreement to commit or aid in an unlawful act with another person or persons with a shared criminal intent and an overt act was done in furtherance of the conspiracy." Commonwealth v. Lambert, 795 A.2d 1010, 1016 (Pa.Super.2002).

> The essence of a criminal conspiracy is the common understanding that a particular criminal objective is to be accomplished. Mere association with the perpetrators, mere presence at the scene, or mere knowledge of the crime is insufficient. Rather, the Commonwealth must prove that the defendant shared the criminal intent, i.e., that the Appellant was an active participant in the criminal enterprise and that he had knowledge of the conspiratorial agreement. The defendant does not need to commit the overt act; a co-conspirator may commit the overt act.

Id. (internal citations and quotation marks omitted). "Once there is evidence of the presence of a conspiracy, conspirators are liable for acts of co-conspirators committed in furtherance of the conspiracy," whether or not the conspirator acted as a principal in the commission of the underlying crime. Id.

Here, the evidence established that the Defendant, Lora, Munn, Upshur and Rodriguez entered into an agreement to commit residential burglaries and that the Defendant was an active participant in that enterprise. Each burglary for which the Defendant was convicted was committed in furtherance of that conspiracy. Accordingly, the Defendant was criminally liable for each burglary that was committed.

32

For the reasons set forth above, this Court found the Defendant's claims to be without merit.

BY THE COURT:

4-3-18
**Date**

_____
**DIANE E. GIBBONS, J.**

Antonetta Stancu, Chief Deputy District Attorney
Bucks County District Attorney's Office
100 N. Main Street
Doylestown PA 18901


Sharif N. Abaza, Esquire
244 East Court Street
Doylestown PA 18901